UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO: |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT AND JURY DEMAND** |
| WESTERN NEW ENGLAND | ) | |
| UNIVERSITY, JENNIFER KOLINS, | ) | |
| MAUREEN KEIZER, AND | ) | |
| JEANNE S. HART-STEFFES, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

1.     This is a civil action for relief for injuries that the Plaintiff John Doe (hereinafter "Mr. Doe" – by pseudonym) sustained as a result of actions and omissions by the Defendants Western New England University ("WNEU"), Jennifer O. Kolins, Maureen Keizer, and Jeanne S. Hart-Steffes, (together the "Defendants").

2.     While he was a college student at WNEU, two of Mr. Doe's female friends, also WNEU students, nearly committed suicide as a result of depression brought about by ongoing sexual misconduct, harassment, unlawful behavior, bullying and Title IX misconduct committed by fellow members of the WNEU tennis team and one assistant coach.

3.     Mr. Doe reported to the Defendants about the existence of sexual misconduct, harassment, unlawful behavior, bullying and misconduct resulting in the victimization of his two female friends, including reportable gender-based misconduct in violation of the Educational Amendments of 1972 (hereinafter "Title IX"), 20 U.S. § 1681 *et seq*.

4. Mr. Doe asked the Defendants to investigate and take appropriate disciplinary action.

5. Mr. Doe's reports implicated WNEU, some of its star tennis athletes, full-time and assistant tennis coaches, and administrators for failing to police WNEU, train employees, and maintain a college experience free from gender-based unfair treatment, sexual misconduct, harassment, unlawful behavior, and bullying.

6. The Defendants failed to adequately investigate the sexual misconduct, harassment, unlawful behavior, and bullying, and Title IX infractions reported by and witnessed by Mr. Doe.

7. Instead, the Defendants retaliated against Mr. Doe (a Title IX reporter and witness) by dismissing his reports and instead finding *Mr. Doe* in violation of WNEU's Code of Conduct, denying Mr. Doe procedural rights under WNEU's own policies, and sanctioning Mr. Doe, among other misconduct detailed herein. The defendants refused to hear Mr. Doe's version of the events and refused to review text messages that demonstrated that he had not violated any WNEU policies.

8. This does not appear to be the first time that the Defendants, in response to reports of violations of Title IX and other misconduct, have credited the word of a female student over the word and exculpatory evidence of a male student. *See Doe v. Western New England University, et al.,* Civil Action No. 315-cv-30192 (MAP) (Complaint alleging that in 2015 the same Defendants, in response to a Title IX report, adopted as true the wholesale allegations of a female complainant without considering the word or exculpatory evidence (text messages) proffered by a male accused).

9. In this case, with respect to Mr. Doe, the Defendants:

a.   violated Title IX by retaliating against Mr. Doe who reported Title IX misconduct and participated as a Title IX witness;

b.   violated Title IX by continuing its pattern of favoring a female student's testimony over a male student's (Mr. Doe) testimony and evidence;

c.   violated Mr. Doe's rights under federal law by failing to provide him with disability accommodations while he was a complainant and subject of WNEU investigations;

d.   breached WNEU's contract with Mr. Doe and the covenant of good faith and fair dealing by violating WNEU's own procedures as provided in the applicable Student Handbook and Code of Conduct and other policies;

e.   intentionally and negligently caused Mr. Doe emotional distress;

f.   violated Mr. Doe's privacy by releasing his private medical and disability information without his permission;

g.   falsely branded Mr. Doe in violation of the Code of Conduct;

h.   ostracized Mr. Doe by ordering him not to speak to his friends and social support group on campus; and

i.   engaged in other negligence and misconduct as stated herein.

10.    Prior to reporting the events described below, Mr. Doe had successfully managed his diagnosed autism, obsessive-compulsive disorder, and other disabilities to the point where he was a high-functioning student with a promising internship and employment opportunities on the horizon.

11.    The Defendants' misconduct caused Mr. Doe's once dormant disabilities to surge to an all-time high and unmanageable level, and further caused Mr. Doe to suffer lost wages,

depression, post-traumatic stress disorder, insomnia, vomiting, nightmares, diarrhea, emotional

distress, and other physical and mental anguish and injuries.

## JURISDICTION

12.     Federal question jurisdiction exists under 28 U.S.C. § 1331 arising out of

Defendant WNEU's violations of Title IX of the Education Amendments of 1972, 20 U.S. §

1681 (hereinafter "Title IX") as well as violations of the Americans with Disabilities Act.

13.     Diversity jurisdiction exists under 28 U.S.C. § 1332 as Mr. Doe is a Connecticut

resident and all Defendants, upon information and belief, are either Massachusetts or New York

residents.

14.     The amount in controversy exceeds $75,000.

## VENUE

15.     Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

16.     The Plaintiff, Mr. Doe, is an individual who resides with his parents in

Connecticut.

17.     During the events described herein, Mr. Doe was a full-time student at WNEU

and resided on campus at WNEU, which is located at 1215 Wilbraham Road, Springfield,

Hampden County, Massachusetts.

18.     WNEU is a federally funded, private, non-profit university.

19.     Defendant Jennifer O. Kolins (hereinafter "Coach Kolins") is an employee of

WNEU, having residence in Springfield, Hampden County, Massachusetts.  At all relevant

times, Coach Kolins was the coach of both the men's and women's tennis teams at WNEU.

Coach Kolins also holds the title of "Outreach Coordinator" at WNEU.

20.    Defendant Maureen Keizer (hereinafter "Dean Keizer") is an employee of WNEU, having residence in Massachusetts. At all relevant times, Dean Keizer has worked as the Associate Dean of Students at WNEU.

21.    Defendant Jeanne Hart-Steffes (hereinafter "Dean Hart-Steffes") is an employee of WNEU, having residence in Skaneateles, New York. At all relevant times, Dean Hart-Steffes has been the Dean of Students and the Vice President for Student Affairs at WNEU.

## APPLICABLE LAW AND POLICY

22.    Title IX of the Education Amendments of 1972 bars gender-based discrimination by federally funded educational institutions.

23.    "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

24.    In *Jackson v. Birmingham Board of Education*, the Supreme Court held that retaliation by a federally funded educational institution against someone who complains of gender discrimination is actionable under Title IX. 544 U.S. 167, 171, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005).

25.    According to the Supreme Court, Title IX must be accorded "a sweep as broad as its language." *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896 (1st Cir. 1988) (citing *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521, 102 S. Ct. 1912, 72 L. Ed. 2d 299 (1982)).

26.    Title IX prohibits retaliation against a person for complaining about sex discrimination in the operation of a federally funded educational program or activity. *See Bryant v. Gardner*, 587 F. Supp. 2d 951, 954 (N.D. Ill. 2008).

### FACTS

27.     During the academic year 2015 – 2016, Mr. Doe was a third-year student at WNEU.

28.     At all relevant times, WNEU was aware that Mr. Doe was diagnosed with autism, obsessive compulsive disorder, and other disabilities, because Mr. Doe registered his disabilities with WNEU as part of an individualized education program.

29.     For example, According to documentation filed with WNEU as early as April 5, 2012, the Defendants knew that Mr. Doe suffered from:

    a.  Asperger's Syndrome;

    b.  a lack of understanding subtleties and non-literal interpretation of other people's words;

    c.  obsessive-compulsive disorder;

    d.  a need for routine;

    e.  depression;

    f.  over-sensitivity to lots of different sensory stimuli; and

    g.  increased anxiety when faced with changes.

30.     Mr. Doe's physician certified in written correspondence to WNEU that Mr. Doe suffered from the various disabilities described herein.

31.     Mr. Doe's disabilities made it difficult for him to make friends and socialize. When he registered his disabilities with WNEU he specifically noted the difficulty he had with regard to the need to "socialize and interact with my peers."

32.     However, Mr. Doe found one positive group of friends on campus when he joined the men's and women's tennis team.

33.     Mr. Doe had been a tennis player on the WNEU tennis team all three years at WNEU, and he has also had a work-study position stringing racquets for the team.

34.     Due to his disabilities, Mr. Doe had practically no other friends, acquaintances or social interactions at WNEU during his four years at the school outside of the tennis team. Stripping Mr. Doe of that support group posed an enormous and obvious risk to Mr. Doe's health based on his known disabilities.

## MR. DOE AND HIS TEAMMATES PAULA PERSON AND SUSAN STUDENT HAD A HEALTHY AND SUPPORTIVE FRIENDSHIP

35.     Mr. Doe was close friends with two underclassmen female members of the WNEU women's tennis team, Paula Person (a pseudonym) and Susan Student (a pseudonym).

36.     As a friend, Mr. Doe frequently provided advice to Ms. Person and Ms. Student and served as a confidant for each.

37.     The healthy and supportive friendship between Mr. Doe, Ms. Person and Ms. Student is best evidenced by their text messages during the weeks prior to the facts that resulted in this action, as re-stated in the paragraphs that follow.

38.     On February 17, 2016, Ms. Person initiated a text-message conversation with Mr. Doe, in which Ms. Person expressed happiness that Mr. Doe was moving to her dormitory building.

39.     Ms. Person offered to Mr. Doe "anything from a hug to help moving."  In addition, Ms. Person told Mr. Doe, "I'm pretty strong I can give good hugs[.]"  Mr. Doe thanked Ms. Person for her support.

40.     On February 17 and 18, 2016, Ms. Student initiated the following text-message conversation with Mr. Doe in which she expressed happiness that Mr. Doe was moving to her dormitory building:

a.  Ms. Student:   [JOHNNNNNN] I heard you're moving into commonwealth.[1]
We're going to be neighbors!!

b.  Mr. Doe:   I think I'm a floor below you, but sorta :)

c.  Ms. Student:   Do you know what wing you'll be on?

d.  Mr. Doe:   I'll know soon

e.  Ms. Student:   Yay! I'm so happy for you [John]! I hope you feel better soon so
we can have our hangouts again

f.  Mr. Doe:   I think I'll be 114

g.  Ms. Student:   When are you moving? [Ms. Person] and I can help you if you
need it

h.  Mr. Doe:   I can do it myself, thank you though. Soon, within a week. And
yes, I forgot to say before, we can try and all hang out more :)

i.  Ms. Student:   Yayyy!!! And you just let us know when you're free. And if you
need help

41.     On the morning of February 23, 2016, Ms. Person invited Mr. Doe out to lunch,
which invitation Mr. Doe politely declined.

42.     In the afternoon of February 23, 2016, Ms. Person text-messaged Mr. Doe
informing him that she was rejected from a job offer.  Ms. Person told Mr. Doe she was
"disappointed" and that she was "not going to amount to anything," and that "[t]his whole you
need experience to get experience thing is killin [sic] me."

43.     Later on February 23, 2016, Mr. Doe responded to Ms. Person by text-messaging
to her: "It's ok your [sic] still a sophomore, most places don't higher [sic] sophomores.  You will
amount to plenty of good stuff.  And yes, the entire world is having trouble with the experience
thing, but that will get better.  Didn't you have an internship in a pharmacy?  Did you put that
down on your resume?"

---

[1]       "Commonwealth" was the name of the dormitory building in which Ms. Person and Ms. Student then lived
on the WNEU campus in Springfield, Massachusetts.

44.    On February 27, 2016, Ms. Person initiated another amicable text conversation with Mr. Doe.

45.    On February 29, 2016, Ms. Person told Mr. Doe: "Eh I could be better I'm just really annoyed with people especially our team" and "I kind of want to graduate early to get out of here[.]"

46.    On March 2, 2016, Ms. Person initiated another text message conversation with Mr. Doe in which she and Mr. Doe agreed to try to have a meal together on March 4, 2016.

47.    On March 3, 2016, Ms. Person initiated a text message conversation in which she informed Mr. Doe of her ongoing depression, including:

a.  Ms. Person:    [John] I am depressed

b.  Mr. Doe:    About what?

c.  Ms. Person:    I think I'm getting ahead of myself but [I don't know] what to do with my life

d.  Mr. Doe:    Ya life is depressing.  I'm not the best at the subject, and this will be the most hypocritical thing I ever say, but maybe instead of worry about what to do with your life, just live it and be happy."

e.  Ms. Person:    [I don't know] [John] I'm starting to scare myself

f.  Mr. Doe:    Please explain

g.  Mr. Doe:    [Paula]

h.  Ms. Person:    Hi [John]

i.  Mr. Doe:    Hi [Paula].  How are you caring [for] yourself?

j.  Ms. Person:    I don't know how to explain it. I have [Susan Student] and I have you.  [I don't know]…I'm starting to think it's the school. I have never been so depressed before until I came here.  I'm starting to reach the point where I don't care anymore.  I try to care about school but I can't.  Im [sic] losing interest in everything even food. I always catch myself thinking how much I hate life.  I'm not suicidal.  But sometimes I just think all of the BS that I've put up

with isn't worth it. I can't consciously hate life.  I feel like graduating early is the key to my problems because I'll be out of here but I'm really scared of going into the real world and still being this miserable

k.   Ms. Person:   I'm just really scared that I'll never be happy

l.   Mr. Doe:   …I've been to that giving up point many times, believe me. Putting up with the bs is miserable, but atleast [sic] in my experiences the real world is much much better.  It's not perfect, but it's significantly better.  I'm not an expert on happiness but I think you can't just be happy.  You have to really look for and find the things that make you happy and immerse yourself in those to get happiness.  For example penguins make me happy.  I have trouble being mad at the world when I look at penguins.  Find your penguins

m.   Mr. Doe:   Pho [Vietnamese food] makes you happy right? We can get that tonight if you like

n.   Ms. Person:   Pho does make me happy. I have a team dinner tonight and I'm not sure what time

o.   Mr. Doe:   :/ ok maybe Sunday

p.   Mr. Doe:   Sorry you have to go that

q.   Ms. Person:   I'm sorry too

r.   Ms. Person:   LOL

s.   Mr. Doe:   Just bear with it

t.   Mr. Doe:   :)

u.   Ms. Person:   Thanks for being there for me [John]

v.   Mr. Doe:   I do my best. I'm sorry I'm not always quick to reply. You are a good person [Paula]. Don't ever forget that

w.   Ms. Person:    Thanks [John][.] It's hard to believe sometime [sic]"

48.     On March 3, 2016, Ms. Student initiated an amicable text-message conversation with Mr. Doe that carried over into March 4, 2016.

49.     Early in the morning on March 6, 2016, Ms. Person initiated an amicable text-message conversation with Mr. Doe, in which Ms. Person consoled Mr. Doe after an unsatisfactory tennis match.  Ms. Person confided to Mr. Doe that Ms. Person was "stressed out," and that their mutual friend, Ms. Student, was miserable after a negative encounter with her mother.  Ms. Person and Mr. Doe made plans to take Ms. Student out for Vietnamese food on her birthday.

50.     Later on March 6, 2016, Ms. Person initiated two additional separate text-message conversations with Mr. Doe about their plans to take Ms. Student out for her birthday.

## MR. DOE LEARNS THAT MS. STUDENT HAS BEEN SEXUALLY ASSAULTED BY A CURRENT WNEU EMPLOYEE AND ASSISTANT TENNIS COACH

51.     On March 6, 2016, Ms. Person and Mr. Doe took Ms. Student out for a birthday dinner at a local Vietnamese restaurant.

52.     At her birthday dinner, Ms. Student reported to Ms. Person and Mr. Doe that a former member of the male tennis team and current assistant coach, P.J. Nasser, had sexually assaulted her and that this same person was now an assistant coach on the tennis team.

53.     Ms. Student described to Ms. Person and Mr. Doe that the assailant grabbed her in a private sexual part of her body in an unwelcome manner without her consent.

54.     The description of Ms. Student's encounter unequivocally fell into unlawful sexual contact in violation of Massachusetts state law and the WNEU's "Sexual Harassment / Sexual Misconduct and Title IX Policy," within WNEU's Code of Conduct.  However, at the time Ms. Student asked Mr. Doe and Ms. Person to keep the disclosure confidential.

55.     After her birthday dinner, Ms. Student initiated a text-message conversation with Mr. Doe, which included the following text-messages:

   a.   Ms. Student:   Hey [John] I know that you're not the kind of person to go around

|   |   |   |
|---|---|---|
|   |   | telling people stuff but can we just keep what I told you about pj between you, me, and [Paula]? |
| b. | Mr. Doe: | Of course |
| c. | Mr. Doe: | It's the right thing to ask me that, but you know you don't need to ask me that right? |
| d. | Ms. Student: | I know lol I just like to panic about anything and everything's |
| e. | Ms. Student: | *everything |
| f. | Mr. Doe: | I do too :) |
| g. | Ms. Student: | And this is why we are friends! |
| h. | Mr. Doe: | :) |

## THE FLORIDA TENNIS TRIP: MR. DOE WITNESSES ADDITIONAL MISCONDUCT, HARASSMENT, UNLAWFUL BEHAVIOR, AND BULLYING, INCLUDING VIOLATIONS OF TITLE IX

56.     On March 9, 2016, Ms. Student and Mr. Doe engaged in an amicable text-message conversation in which they planned for their upcoming trip to Florida as members of the WNEU tennis team.

57.     On March 11, 2016, Mr. Doe text-messaged Ms. Student wishing her a happy birthday.  Ms. Student responded by thanking Mr. Doe and informing him that the "entire women's team forgot" about her birthday.  The two continued to have an amicable conversation about tennis.

58.     On March 11, 2016, Ms. Person told Mr. Doe that her teammate Joeanna confronted Ms. Person and "put the blame on" Ms. Person by accusing Ms. Person of pulling Ms. Student "away from everyone" on the women's team.  Ms. Person informed Mr. Doe that she was now sitting in her hotel room alone in an attempt to prove the team wrong.  In response,

Mr. Doe encouraged Ms. Person to continue socializing with Ms. Student, including advice such as "You be you."  The conversation continued as follows:

    a.  Ms. Person responded, "That's what I keep telling myself[….]"

    b.  Mr. Doe:      Just hang out with Petra [another teammate], who cares what they think.  If they say something again just tell them it's bs, and everyone else in the team is in their own click so don't pick on me

    c.  Ms. Person:    I'm going to say that next time they come after me

    d.  Ms. Person:    I'm really tired of getting get [sic] shit on for everyone else's behavior

    59.      On March 12, 2016, Ms. Person initiated a text-message conversation with Mr. Doe about whether they would eat dinner with the rest of the tennis team at the Rainforest Café. In this conversation, Mr. Doe informed Ms. Person that he got a small present for Ms. Person and Ms. Student.  The conversation included the following text messages:

    a.  Ms. Person:    [I don't know] if I'm going to the rain forest café, I don't really want to, but is there anywhere else to eat?"

    b.  Mr. Doe:      I don't Either [sic]

    c.  Ms. Person:    "I hate everyone"

    d.  Mr. Doe:      Ya….. The men's team is saying some pretty unforgivable stuff about you and [Susan Student] right now……..

    e.  Mr. Doe:      I'm pretty mad at them

    f.  Ms. Person:    What the FUXK [sic] is wrong with them

    g.  Mr. Doe:      I don't know…..

    h.  Ms. Person:    I'm done with them

    i.  Mr. Doe:      Where are you and [Susan Student] going?

    j.  Ms. Person:    [I don't know] yet we're still not here yet

60.    On March 12, 2016, Mr. Doe initiated a group text-message conversation with Ms. Person and Ms. Student, which included the following messages:

    a.    Mr. Doe:    I'm truly shirt [sic] you two have to go through this

    b.    Ms. Student:    Knowing that we have you makes it easier

    c.    Mr. Doe:    Truly *sorry, not shirt….. And I promise I'll always be here for you two

    d.    Ms. Student:    Thanks [John]

61.    On the night of March 12, 2016, the majority of the men's and women's tennis teams ate dinner together at the Rainforest Café.  Ms. Person, Ms. Student and Mr. Doe, having been bullied, belittled, and harassed, and in one case, sexually assaulted, opted to eat together at House of Blues, with one of the team coaches.

62.    After dinner, while getting ice cream, a male teammate, Andres Otero, stared intimidatingly at Ms. Student.  Mr. Doe witnessed this event unfold.  Mr. Otero was a close friend and former roommate of P.J. Nasser, the assistant coach who had sexually assaulted Ms. Student.  Mr. Otero walked up close to Ms. Student, confronted her while using intimidating and threatening language and gestures toward her.  A verbal altercation ensued between Mr. Otero and Ms. Student.  Afterward, Mr. Doe could see that Ms. Student was visibly upset by the confrontation and bullying.

63.    On March 13, 2016, WNEU's president, Anthony S. Caprio, traveled to Florida to visit the team and have dinner with the team and Coach Kolins.

64.    On March 13, 2016, Ms. Student initiated the following text message conversation with Mr. Doe, which included the following messages:

    a.    Ms. Student:    Oi how are you feeling?

    b.    Mr. Doe:    Like I've been drugged.... Trainer said it's definitely sun poisoning

and I need to rest. How are you and [Paula] holding up?

c.  Ms. Student:   [Paula]'s been throwing up a lot. She stayed back from practice. Practice was horrible. I'm going to forward you what I told [Paula] about how it went

d.  Mr. Doe:      :(

e.  Ms. Student:   So I got to practice and put my bag down, went to the bathroom and cried. Then I came back, warmed up and we had a meeting with both teams and coach was lecturing us because someone (I think pj [Assistant Coach P.J. Nasser]) stole a plate from rainforest cafe and someone public urinated (which I'm assuming was Yawgel [a member of the men's tennis team] based on [Assistant Coach P.J. Nasser's] pjs snapchat story) and we had to walk around the courts alone with our racquet in our hand and talk to a captain individually about why we think we deserve to be on the team and I broke down crying to Joeanna. Then we met as both teams again and got lectured again and walked around the courts again to talk to a captain about what the consequences should be for the stealing and public urination and Andres was walking in front of me the whole time talking to various men and I was sobbing the whole time.

**I almost walked up behind him and bashed his skull in with my racquet. It took so much self control. And so all the men and women saw me crying and our team is just terrible [Paula]. There could be legal consequences if the security of Disney gets the license plates and reports us. It's so bad and my eyes burn so badly** (emphasis supplied).

f.  Mr. Doe:      Talking to captains was a fucking horrible idea, she doesn't fucking understand that the captains are the fucking problem.it was yawgal [member of men's tennis team] who urinated in public, and it was either [Assistant Coach P.J. Nasser] pj or Andreas [Otero] who stole the plate-I'm not sure which. I'm sorry you had to go through that [Susan Student]. I'm so sorry you have to go through all of this. You and [Paula] are so much better people then both teams, I wish I could do something for both of you.  Crying in this case does not mean you are weak at all. It doesn't.  I run and sit in the rain whenever I get the chance because it covers my tears. I think of rain as, in a way, the world's apology to people with pride because I don't want to accept my tears. I want to be strong enough to not cry,[ ]but i cry so much I run out of tears. But [Susan] you are honestly the strongest girl I know, I understand the weight on your shoulders so much it hurts me to watch you be the

outstanding person you are- because I know the costs of doing so with the world on your back first hand. It's not a cost humans are meant to pay, I wish I could take some of that weight off your shoulders but most of it I can't - But i can help refresh your strength. I know even if I say this you won't because you have to much pride-but you really should. you can just come and cry on my shoulder, I'm not kidding in any way. Just come and vent to me and I'll give you a big hug and you will know that you aren't alone in the world. It's a shity world with shity people, but you are not alone.

g.  Ms. Student:      Thank you so much [John]. I don't know how you put up with this for four years. It's so draining and I don't know that I can make it another 2 years. But thank you for being there and of course you know me and [Paula] are there for you always

h.  Mr. Doe:         I know you both are there for me :) , but it's more important for me to be there for both of you especially right now. Please keep me posted about how things are going

i.  Ms. Student:      Of course

65.     Later on March 13, 2017, Mr. Doe reached out to Ms. Person via text message to console her further.  The following conversation ensued:

a.  Mr. Doe:         How are you holding up [Paula]?

b.  Ms. Person:      I want to go home

c.  Ms. Person:      I don't want anything to do with these people.  They made me so upset I threw up all night and morning

d.  Mr. Doe:         I'm sorry.  I wish I could just beat them up.  It's not fair and I wish I could change it.  Just remember you have done nothing wrong and even though both teams suck, you have at least one person on each team who truly truly cares about you [referring to Mr. Doe and Ms. Student]

e.  Ms. Person:      I know you care about me [John]. But no one else does.  No one else gives a shit that I was crying and miserable. I'm irrelevant on this team.  I'm not in the line up I'm always sick and can never make practices. [Susan]'s number one they would do anything to keep her. They won't give a shit about me leaving.

f.  Mr. Doe:         [Susan] cared you where [sic] crying.  You are right, they would

put more effort into keeping [Susan], they would meet practically any condition she has….. That's just how it is- even though it's morally wrong. but [sic] isn't one of [Susan]'s conditions keeping you?

g. Ms. Person:   Probably but I can't be on this team Anymore. [sic] I'm Not [sic] important enough to keep"

h. Mr. Doe:   You are important to me and [Susan] and Petra. I can't make you important to everyone else, it's just not in my power. I don't think she can help, in fact it would probably make It [sic] worse, but did you talk to coach [Coach Kolins] at all?

i. Ms. Person:   Yeah we told her we wanted to leave[.]  And she said 'trust me give me half a day and we'll try to fix this[.]  And she didn't want me to call my mom but I did anyways

j. Mr. Doe:   Do you know what they did today?

k. Ms. Person:   Mom wants me home

l. Ms. Person:   About the stolen plate and public urination ?

m. Mr. Doe:   And every member talked one on one with the captains about why they deserve to be on the team

n. Mr. Doe:   But the problem is the captains are a big part of the problem.

o. Ms. Person:   They are I gurentee [sic] they will blame me for the public urination. It was yawgel [sic] [male tennis player] but I didn't know about it

p. Mr. Doe:   And she doesn't realize that. Did you say anything about the captains to her?

q. Ms. Person:   She [Coach Kolins] didn't want me to name names

r. Ms. Person:   But I did ANYWAYD [sic]

s. Mr. Doe:   Well they all know it was yawgel [sic] , I can promise that. But did you tell coach that the captains are a big part of the problem?

t. Ms. Person:   I tried to but she just kept talking and telling us it's fixable

u. Mr. Doe:   Wait wait wait wait

    v.  Mr. Doe:    When you talked to coach and told her you wanted to quit she told you not to give names of the people who are upsetting you?

    w.  Ms. Person:    Yeah

    x.  Ms. Person:    **She [Coach Kolins] doesn't believe us cause she said it didn't make sense** [emphasis supplied].

66.    Later on March 13, 2016, Mr. Doe initiated a group text message conversation with Ms. Person and Ms. Student in which he asked "Are you two going to the dinner tonight?" Ms. Person replied by saying, "Yes I don't want to tho [sic]" and "I'm not welcomed[.]"

67.    On March 13, 2016, between 3:09 p.m. and 4:06 p.m., Mr. Doe and Ms. Student had an amicable text-message conversation in which they each expressed concern for Ms. Person's well-being.

68.    On March 13, 2016, at approximately 3:38 p.m., Mr. Doe initiated the following group text-message conversation with Ms. Student and Ms. Person:

    a.  Mr. Doe:    What are you two doing right now?

    b.  Ms. Person:    Crying.

    c.  Mr. Doe:    What is your house number?

    d.  Ms. Person:    2948

69.    Approximately ten minutes after receiving the room number for Ms. Person and Ms. Student, Ms. Student initiated the following text-message conversation with Mr. Doe:

    a.  Ms. Student:    Did you get lost?

    b.  Mr. Doe:    No its [sic] just really far

    c.  Ms. Student:    LOL okay

70.    On March 13, 2016, Mr. Doe visited Ms. Person and Ms. Student in their hotel room upon their invitation.  Ms. Student and Ms. Person told Mr. Doe that they were being

bullied, harassed, and mistreated on the tennis team.  Ms. Student and Ms. Person each cried on Mr. Doe's shoulder, and Mr. Doe gave them positive advice and moral support.  Ms. Student and Ms. Person disclosed to Mr. Doe that they were abusing pills and medicine as a result of their interactions with the team.

71.     After leaving the hotel room belonging to Ms. Student and Ms. Person, Mr. Doe later texted each of them in a group text-message conversation:

 a.  Mr. Doe:   I'm pretty beat, I'm going to be in my room if you need me.  You can call me too if I don't answer any text messages, don't hesitate to call

 b.  Ms. Student:  Thanks [John].  Get some rest

72.     On or about the night of March 13, 2016, Ms. Person and Ms. Student, still distraught, attempted to commit suicide by taking an excessive amount of medication pills.

73.     Fortunately, Ms. Student sent a dramatic text message to her friend, Rebecca Moore, in which Ms. Student indicated that she was suicidal.  In response, Ms. Moore contacted the WNEU police.

74.     Around 3:30 a.m. on March 14, 2016, the WNEU police contacted Assistant Coach P.J. Nasser, who was with the team in Florida.  Assistant Coach Nasser went to Coach Kolins' room and awoke her.  For unknown reasons, the two coaches also woke P.J. Nasser's close friend and former roommate, Andres Otero, and together they went to Ms. Person's and Ms. Student's room and woke them from their sleep.

75.     Ms. Student and Ms. Person appeared to be upset to Coach Kolins, who did not seek any medical professional help of any kind.  Instead, Coach Kolins brought in P.J. Nasser's close friend, Andres Otero, to speak to Ms. Person and Ms. Student and try to help control the situation.

76.     Coach Kolins did not at any point seek any medical treatment for either Ms. Person or Ms. Student.  Coach Kolins failed to offer or encourage Ms. Person or Ms. Student to seek medical attention.

77.     Coach Kolins was upset that two of her players, Ms. Person and Ms. Student, attempted to commit suicide on the night that the WNEU president visited the team in Florida.

78.     Ms. Person and Ms. Student explained to Coach Kolins, Assistant Coach P.J. Nasser, and Nasser's close friend, Andres Otero, that they were upset about the way that they were being treated by the team and that Mr. Doe had informed them that some members of the men's tennis team said negative things about Ms. Person and Ms. Student.

79.     In order to avoid a scene, Coach Kolins did everything in her power to downplay and cover up the attempted suicide, mischaracterize it as an over-reaction, and deny existence of misconduct and negligence by her, her tennis players and her assistant coaches.  For example, Coach Kolins repeatedly told Mr. Doe and others that she was in "damage control mode."

80.     As early as 7:00 a.m. on March 14, 2016, Coach Kolins was spreading the word that the incident was not a suicidal ideation or attempt.  Instead, Coach Kolins was falsely characterizing the incident as a "miscommunication."

81.     On the morning of March 14, 2016, Mr. Doe checked on Ms. Student and Ms. Person by texting them and asking how they were doing.

82.     Throughout the remainder of the Florida trip, Mr. Doe comforted Ms. Person and Ms. Student and he interacted positively and supportively with them just as he had in the past.

83.     For example, on March 15, 2016, Mr. Doe initiated the following group text-message conversation with Ms. Student and Ms. Person:

    a.  Mr. Doe:        How is your match going?

    b.  Ms. Person:   I'm really mad cause they were going to play everyone else but me

    c.  Ms. Person:   But Cory backed out

    d.  Ms. Person:   Of doubles to let me play

    e.  Ms. Person:   We quit by next year.  If not earlier

84.    Also on March 15, 2016, Ms. Student commented to Mr. Doe and Ms. Person in a group text-message conversation, "Trust me, we wish we weren't going [out to dinner with the team] so we could be back home[.]"

85.    Coach Kolins falsely blamed the ordeal on Mr. Doe and ordered him not to travel home with Ms. Student as they had planned, in an effort to drive a wedge between Ms. Student and Mr. Doe.

86.    Without any valid reason or authority to do so, Coach Kolins ordered Ms. Student and Mr. Doe to stay away from one another in order to cover up her failure to properly supervise the players and coaches.

87.    After returning to Springfield, Mr. Doe had only positive interactions with Ms. Student and Ms. Person.  For example, on March 26, 2016, after returning to Springfield, Mr. Doe imitated the following amicable text-message conversation with Ms. Student:

    a.  Mr. Doe:     How are you holding up [Susan]? Did you go home for Easter?

    b.  Ms. Student:   Yeah I went home last night.  I'm okay.  Very happy to be home for a little bit and get some sleep

    c.  Mr. Doe:     OK I'm glad to hear that

88.    Mr. Doe never once said or did anything to Ms. Student or Ms. Person which could be reasonably characterized as causing them emotional distress.  To the contrary, the above text messages bear out the exact opposite.

**PROTECTED ACTIVITY: MR. DOE REPORTED TO COACH KOLINS ABOUT THE
EXISTENCE OF SEXUAL MISCONDUCT, HARASSMENT, UNLAWFUL BEHAVIOR,
AND BULLYING, INCLUDING VIOLATIONS OF TITLE IX**

89.     During the week of March 16 – 23, 2016, upon returning to Springfield after the

Florida trip, Mr. Doe met with Coach Kolins because he was concerned about his two friends

Ms. Student or Ms. Person and he was disgusted by the sexual misconduct, harassment, unlawful

behavior, negligence and bullying committed by WNEU tennis players and coaches, whom

Coach Kolins failed and refused to supervise.

90.     Mr. Doe reported the following items to Coach Kolins, including but not limited

to misbehavior by male and female tennis players, to include sexual misconduct, bullying, sexual

harassment, gender-based harassment, disrespectful conduct, public urination, indecent exposure,

larceny, underage drinking, disrespect toward opponents on the tennis court, negatively

representing WNEU, and other illegal and other willful and negligent misconduct by Coach

Kolins's players and coaches.

91.     Mr. Doe reported about one tennis player, Kevin Yawgel, removing his penis

from his pants and urinating in public despite the fact that families and children are prominent in

the Disney World area.  When Mr. Doe began to detail further sexual misconduct to Coach

Kolins by her players and Assistant Coach P.J. Nasser, including Assistant Coach P.J. Nasser's

sexual assault of Ms. Student, whom Coach Kolins had the responsibility to supervise and

control, Coach Kolins cut off the conversation because she did not want to know about it.

92.     Mr. Doe told Coach Kolins that there was more sexual misconduct, but Coach

Kolins got angry that Mr. Doe discredited her players and cut him off.  Coach Kolins stated that

Mr. Yawgel simply must have "really had to go to the bathroom," and that "he couldn't hold it."

Coach Kolins told Mr. Doe that she did not Mr. Yawgel to get in trouble because he was

intending to apply to Pharmacy School. Mr. Doe attempted to tell Coach Kolins about additional misconduct, both sexual and non-sexual, but Coach Kolins stopped him, and she abruptly ended the meeting with Mr. Doe.

### WNEU AND THE OTHER DEFENDANTS RETALIATED AGAINST MR. DOE

93. Upset that Ms. Person and Ms. Student did not eat with the rest of the team at the Rainforest Café, Coach Collins falsely blamed Mr. Doe for "convincing" Ms. Person and Ms. Student to not eat dinner with the rest of the team.

94. Coach Kolins discouraged Ms. Person and Ms. Student, as well as other members of the team, from socializing with Mr. Doe. Before any investigations commenced, Mr. Doe was banned from practicing with the tennis team.

95. Based on Mr. Doe's reports to Coach Kolins about her players and coaches, she and WNEU supposedly initiated a Title IX investigation.

96. Coach Kolins was heavily involved in the inadequate Title IX investigation despite her open and obvious conflict of interest between getting to the truth of Mr. Doe's reporting and covering up her tennis team's misconduct, her leadership failures, and her deliberate cover-up both of the team's misconduct and her willful and negligent failure to supervise the players and coaches.

97. Coach Kolins was permitted to conduct interviews and sit in on inquiries and hearings where she sat next to the appointed "investigator."

98. Mr. Doe, who initiated the Title IX complaint, was never asked who should be interviewed, what exactly he witnessed, or what he was told. Mr. Doe was excluded from the inadequate Title IX investigation but for one interview.

99.     Joanne Ollson (hereinafter "Ms. Ollson"), WNEU's Assistant Vice President of Human Resources, spearheaded the inadequate Title IX investigation, with the help of Dean Keizer, Coach Kolins and others.

100.    On March 26, 2016, Ms. Ollson interviewed Ms. Person.

101.    At the time of her interview, Ms. Person had already been told by Coach Kolins to disassociate with her friend Mr. Doe.  Her interviewer elicited false statements from Ms. Person that falsely painted Mr. Doe in a bad light, which false statements are directly contradicted by the text-message conversations detailed more fully above.  These false statements include that Ms. Person did not want Mr. Doe to move to her dormitory, Ms. Person and Mr. Doe were not friends, and implied that Mr. Doe was stalking her and Ms. Student, among others.  These statements are flatly contradicted by the above text messages.

102.    During the inadequate investigation, WNEU violated Mr. Doe's privacy.  When he first registered his disabilities with WNEU, Mr. Doe was assured of WNEU's pledge to confidentiality in writing in a document signed on April 17, 2012.  Mr. Doe had expressed to Bonni Alpert, Ed.D, WNEU's Assistant Dean for Student Disability Services, that he was "VERY uncomfortable" about the fact that WNEU interviewed one of Mr. Doe's teammates. During the interview process, WNEU wrongfully leaked confidential medical information about Mr. Doe's disabilities to Andres Otero without Mr. Doe's permission.  Otero used Mr. Doe's disabilities as a defense to deflect blame away from himself.  In one statement he wrote to WNEU, Mr. Otero argued that WNEU should not rely on the word of a disabled person, such as Mr. Doe.  Mr. Otero also criticized WNEU for not going after Mr. Doe based on his disabilities. WNEU apparently followed Mr. Otero's misguided and discriminatory advice.

103.     Incredulously, WNEU allowed Coach Kolins, who was directly implicated in the reported misconduct, to interview Ms. Student.  Coach Kolins asked Ms. Student about her altercation with Assistant Coach P.J. Nasser's close friend, Andres Otero.  According to her own notes, Coach Kolins wrote that Ms. Student was "caught completely off guard" and allegedly said that she had no idea what Coach Kolins was talking about, again in flat contradiction of the text messages above.

104.     Based on Ms. Student's reaction, Coach Kolins wrote in her notes, "We concluded [Mr. Doe] was lying," without ever speaking to Mr. Doe.

105.     Making false statements is a violation of the WNEU Code of Conduct.  However, no attempts were made to determine whether Ms. Student or Ms. Person had told the truth.  Indeed, WNEU refused to review Mr. Doe's text messages that illuminated that he was the only witness telling the truth.

106.     Coach Kolins and Ms. Ollson sent summaries of their interviews of Ms. Student and Ms. Person to Dean Keizer.

107.     On March 28, 2016, WNEU questioned Mr. Doe about his Title IX report concerning the tennis players and coaches.  Coach Kolins was improperly allowed to sit in on the questioning despite the fact that she was implicated by his reports.  Mr. Doe was caught off guard because he never expected Coach Kolins would be present.  Throughout the questioning, Coach Kolins glared at Mr. Doe in order to intimidate him.

108.     Despite requesting disability related accommodations at the Title IX hearing, Mr. Doe was not provided with a recording device, note-taking aids, an advocate, or any reasonable accommodations pursuant to his disabilities or his individualized education program, which were registered with Defendant WNEU prior to the facts leading to this case.  Although Mr. Doe's

father was permitted to sit in, Mr. Doe was not provided any notice or idea of what the investigation sought to uncover, or that Mr. Doe himself was suspected of misconduct.

109.     As a Title IX complainant under WNEU's Title IX procedures as listed in the Student Code of Conduct, Mr. Doe was contractually entitled to but WNEU deprived him of:

     a.   a pre-hearing informational meeting with the administrative officer;

     b.   documentation of the investigation;

     c.   a written outline of the judicial process and oral explanation of the process;

     d.   an advisor of his choice;

     e.   the ability to hear all witness statements;

     f.   the ability to present all evidence available;

     g.   the ability to request accommodations; and

     h.   the opportunity to request a review of the decision.

110.     However, before or during Mr. Doe's questioning in the inadequate Title IX investigation:

     a.   Mr. Doe was never informed that WNEU or Coach Kolins suspected him of making false statements in violation of the WNEU Code of Conduct;

     b.   Mr. Doe was never informed that WNEU or Coach Kolins suspected him of any other Code of Conduct violations;

     c.   Mr. Doe was not entitled to view any of the evidence or statements, nor was he notified about anything that any witnesses had said about him;

     d.   Mr. Doe was not permitted to have an attorney with him when he was questioned;

     e.   Mr. Doe was not provided with a university advocate;

    f.   Mr. Doe requested but was not afforded disability accommodations that he was permitted to use in class pursuant to his individualized education program;

    g.   Mr. Doe was denied the ability to be accompanied by a note-taker or be assisted by text-to-speech software; and

    h.   Mr. Doe was denied extra time to compose himself.

111.    Mr. Doe was treated like a subject rather than a whistleblower or a witness who had reported sexual misconduct, harassment, unlawful behavior, bullying, and misconduct banned by Title IX.

112.    WNEU's Title IX policy, as contained within the Student Code of Conduct, was deficient in that it did not provide adequate anti-retaliation measures.  It failed to comply with federal Title IX guidelines.  WNEU failed to adequately train its employees, including all named Defendants, with respect to Title IX compliance and anti-retaliation.

113.    WNEU also had a separate competing Title IX policy ("WNEU's stand-alone Title IX Policy"), which was materially different from WNEU's Code of Conduct Title IX policy.

114.    WNEU's stand-alone Title IX Policy provided:

    a.   WNEU will adhere to the Americans with Disabilities Act of 1990 (ADA) in its Title IX investigations, designates an ADA Coordinator and refers to the Office of Student Disability Services as a resource in Title IX cases where necessary.

        i.   However, neither this policy nor these disability resources and accommodations were ever offered to Mr. Doe during the instant case despite the fact that WNEU openly discussed Mr. Doe's disabilities throughout the Title IX and subsequent Code of Conduct cases.

b.  Retaliation is prohibited.

   i.  Again, Mr. Doe was never provided with this policy, any "anti-retaliation"
       or reporter's rights information, or otherwise safeguarded from retaliation
       by WNEU.

c.  Complainants may complete a "Complaint Reporting Form" with the Title IX
    Coordinator.

   i.  Mr. Doe was never informed of or provided with this opportunity.

d.  Complainants are afforded "privacy of the information to the greatest extent
    practicable." Further, "[t]hrough all investigations and hearings of complaints
    arising from discrimination and harassment, both formal and informal, the
    confidentiality of the proceedings and the identities of parties to the complaint
    shall be protected to the fullest extent practicable under the facts and
    circumstances of each case."

   i.  These policies were never provided or explained to Mr. Doe.  In contrast,
       Mr. Doe's report and identity were shared among WNEU employees and
       freely given to witnesses.  Mr. Doe's report and information were later
       used against him in a Student Conduct investigation and finding.

e.  "All complainants should be given a copy of the Harassment, Discrimination **and
    Retaliation Reporting Pamphlet** and the Emergency Information and Resources
    document." (emphasis added).

   i.  None of this information was provided to Mr. Doe.

f.  "If a student/employee who is party to a Title IX Investigation chooses legal
    counsel as an advisor, all communication as to process and procedures relevant to

the University's investigation and hearing process will be communicated directly

to the party's legal counsel by the office of the General Counsel of the

University."

    i.   Mr. Doe was never offered an attorney during the inadequate Title IX

       investigation .

g.   Formal resolution of Title IX complaints shall be by a Committee of members

    comprised of tenured faculty, and no more than three persons of the same gender

    on the Committee.

    i.   WNEU violated each of these requirements in the case that Mr. Doe

       reported.  No students appointed to the Committee per the requirements of

       the Title IX policy.

h.   "Either party may challenge any member's eligibility for cause…."

    i.   Mr. Doe was denied the opportunity to challenge Coach Kolins

       involvement in his Title IX case.

i.   The parties and their advisors may review and read the investigative record, call

    witnesses, and present evidence, appeal, and request reviews.

    i.   Mr. Doe was deprived of these rights.

j.   Each party has the right to be present for the entirety of the hearing.

    i.   In Mr. Doe's case, he was excluded from all phases except his own

       questioning.

k.   The right to be free from retaliation.

    i.   As described herein, this right was stripped away from Mr. Doe.

115.    In violation of the above policies, Mr. Doe experienced a hostile interrogation designed to shield the school, team and its coaches and players.

116.    Mr. Doe's father attended his son's Title IX questioning and agreed that it was hostile in nature toward Mr. Doe.

117.    During the Title IX questioning, Mr. Doe became physically ill.

118.    After leaving the Title IX questioning, Mr. Doe fell to the floor in the hallway and began shaking and vomiting.

119.    WNEU's Assistant Dean for Student Disability Services, Bonnie Alpert, remarked to Mr. Doe and his family that what WNEU had done to Mr. Doe was completely improper.

120.    On March 30, 2016, WNEU closed its inadequate investigation and determined that no Title IX offenses had occurred.

121.    As the person who reported Title IX misconduct, Mr. Doe was not provided a summary of the evidence or detailed findings pursuant to his complaint.

122.    Simultaneous with its March 30, 2016 baseless decision finding no Title IX wrongdoing by Coach Kolins, her assistants, or her players, WNEU recommended that *Mr. Doe* be investigated for violating WNEU's Student Code of Conduct by allegedly making false statements and causing "emotional distress" to Ms. Person and Ms. Student.

123.    Other than Mr. Doe, no one else received an adverse recommendation or finding from WNEU's Title IX investigation.

124.    At all times the Defendants were fully on notice of Mr. Doe's disabilities based on Mr. Doe registering those disabilities with the Defendants' Office of Disability Services through reasonable accommodation requests and individualized education programs.  The

Defendants never accommodated Mr. Doe's disabilities in the Title IX investigation or the ensuing Code of Conduct investigation.

125.    Without authorization to do so, on March 31, 2016, Dean Hart-Steffes telephoned Mr. Doe's father and expressed to him that Mr. Doe was under investigation and that she was concerned for Mr. Doe's health and well-being.

126.    Internal WNEU correspondence dated April 5, 2016 details that the Defendants then discussed that Mr. Doe "has been very sick with grief and anxiety since the [T]itle IX hearing." Despite these acknowledgments of Mr. Doe's disability-related frailty and egg-shell status, the Defendants pushed harder against Mr. Doe.

127.    Dean Keizer spearheaded WNEU's Code of Conduct investigation against Mr. Doe, which posed a conflict of interest because she was a witness from the inadequate Title IX investigation arising out of Mr. Doe's report of sexual and other misconduct. WNEU and Dean Keizer ordered Mr. Doe to testify as a subject in a Code of Conduct investigation without an attorney, his parents, or a dedicated advocate.

128.    On April 1, 2016, Mr. Doe's father sent the following message to Defendant Dean Hart-Steffes:

Dean Hart-Steffes,

I appreciate your returning my phone call to Coach Collins.

We came and picked up [Mr. Doe] from school last night. He has been throwing up continually (for weeks) due to the stress of this. He was feeling so poorly that we needed to bring him home. He has another doctor's appointment this afternoon.

I would appreciate if you could better fill me in on the timeline for Monday and the week so we can plan our schedule. I will need to attend with [Mr. Doe][2] and I need an understanding of exactly what [Mr. Doe] is being investigated for. I

---

[2]    Mr. Doe's father was later denied permission to attend the Code of Conduct questioning.

would appreciate if you could provide that today; I remain confused and need to manage [Mr. Doe] over the weekend.

Thank you,

[Mr. Doe's Father]

129.    On April 3, 2016, Dean Hart-Steffes emailed Mr. Doe's father and informed him that she recognized that Mr. Doe "may/will need an advocate during this process"[3] and that she was "mindful that this is taking an incredible toll on [Mr. Doe]."

130.    On April 4, 2016, Mr. Doe's father sent the following message to Defendants Dean Hart-Steffes and Dean Keizer:

Dean Hart-Steffes,

I tried to call your office this morning to discuss the situation.  You are correct that this process is taking an incredible toll on [Mr. Doe] and he will definitely need support if you choose to continue to move forward.  You should know that being a witness and fully cooperating in the Title IX process has significantly increased [Mr. Doe]'s anxiety and is detrimentally affecting him.  He is currently at home and will have a cat scan today. We will drive him back and forth to campus for classes when he is ready to go.  Given all that has happened with the Title IX investigation in the last few weeks, I am very concerned about initiating this new process and the continued negative effect on [Mr. Doe]'s health and academics.

As you indicated to me, getting everyone back to 100% concentrating on academics is of upmost importance.  In light of this goal, and the option that I saw in the University handbook of informal resolution which meets the goals of "helping students have a better understanding of the University's policies in order to promote responsibility, accountability, and personal development," I am concerned that the university appears to be choosing to go forward with some other process that will continue to detrimentally affect [Mr. Doe] and his studies.

 Please call me at your earliest convenience to discuss.  My cell number is: [REDACTED]. If you could email me a time that works best for you, that would be helpful so that I can be sure to be available to take your call.

Thank you in advance,

---

[3]    Mr. Doe was not provided an advocate at his eventual Code of Conduct questioning.  The only participants allowed in the room were Mr. Doe, Dean Keizer and Bonnie Alpert.  Based on an email from Ms. Alpert on April 4, 2016, she was not briefed on the case regularly and was unaware of her role at the hearing.

[Mr. Doe's father]

131.    As of April 4, 2016, at approximately 10:20 a.m., Dean Keizer still had not

determined what Mr. Doe was actually accused of.  For example, in one email that she sent that

day to Bonni Alpert, Dean Keizer said that at Mr. Doe's questioning she [Dean Keizer] "will use

the statements that were taken as part of the Title IX investigation and do not think I will need to

have 'witnesses' coming in."  This deprived Mr. Doe of his right to call witnesses to speak in his

defense and to hear from and confront his accusers.  With respect to the charges that she was

considering, Dean Keizer wrote: "Tentatively, I am considering at least these two charges to be

"offenses against person" (causing another emotional distress) and Threatening campus order

(providing misleading information to an University official)[.]"

132.    Later on April 4, 2016, Dean Keizer wrote to Ms. Alpert and Dean Hart-Steffes:

From: Maureen H. Keizer
Sent: Monday, April 04, 2016 11:00 AM
To: Bonni M. Alpert <balpert@wne.edu <mailto:balpert@wne.edu> >
Cc: Jeanne Steffes <jeanne.hart-steffes@wne.edu
<mailto:jeanne.hart-steffes@wne.edu> >
Subject: RE: [Mr. Doe]'s hearing

Given that [Mr. Doe]'s dad was able to be present during the recent Title IX
hearing conducted by Joanne Olson and that Mr. [Doe] has been very
'hands on' with [Mr. Doe]'s participation on the men's tennis team, I think
Jeanne suggested your name given [Mr. Doe] being registered with your office.
My limited understanding of these dynamics suggest he has not taken
advantage of any of the office's services!

This type of hearing excludes a parent to be present and an 'advisor'
must be a member of the university community.  I think we will be out by
noon if we start at 10.  [Mr. Doe]'s dad has shared with Jeanne that [Mr. Doe] has
been physically ill, I presume from being nervous.  [Mr. Doe] is in this
situation due to false statements and accusations he made on the Spring
Break trip to Florida with the tennis team. Joanne determined that it
did not rise to a Title IX level (harassment or discrimination) but
referred it to us in Student Affairs due to potential infractions
handled through the student conduct code.  Those are the 2 charges I

previously referred to.

I really appreciate your willingness to help.

Moe [Dean Keizer]

133.     As seen above, Dean Keizer presumed Mr. Doe's guilt before hearing Mr. Doe's side of the events and reviewing exculpatory evidence.  Ms. Alpert's "office," as referenced by Dean Keizer, above, is the Office of Disability Services.  Dean Keizer's comments indicate that she was aware that Mr. Doe was registered with this office as having a disability as well as her willingness to mock Mr. Doe's level of participation with the Office of Disability Services.

134.     Later on April 4, 2016, Dean Hart-Steffes and Dean Keizer discussed who would be a good advisor for [Mr. Doe] at his Code of Conduct hearing, instead of Mr. Doe choosing for himself.  They decided (for Mr. Doe) that Bonni Alpert would best serve him as his "advisor." The email consisted of the following information:

> From: Jeanne Steffes
> Sent: Monday, April 04, 2016 3:28 PM
> To: Maureen H. Keizer; Bonni M. Alpert
> Cc: Jeanne Steffes
> Subject: RE: [Mr. Doe]'s hearing
>
> Dad wants an update- Moe are you okay from me to share with dad the charges as he is trying to help manage [Mr. Doe]'s anxiety?
>
> I will also tell dad that Bonni would best serve [Mr. Doe] as advisor, and need to serve [Mr. Doe] as an advisor in the case because needs to be a member of the University community, Jeanne

135.     The Defendants never informed Mr. Doe or his father that Bonni Alpert participated in email conversations discussing the appropriate charges against Mr. Doe.

136.     The Defendants never informed Mr. Doe or his father that Ms. Alpert demonstrated a "willingness to help" Dean Keizer.

137.    Later on April 4, 2016, Dean Keizer wrote to Dean Hart-Steffes and Bonni

Alpert:

From: Maureen H. Keizer
Sent: Monday, April 04, 2016 3:57 PM
To: Jeanne Steffes <jeanne.hart-steffes@wne.edu
<mailto:jeanne.hart-steffes@wne.edu> >; Bonni M. Alpert <balpert@wne.edu
<mailto:balpert@wne.edu> >
Subject: RE: [Mr. Doe]'s hearing

I think it is best if you respond to [Mr. Doe's father] today since I would not like
the first interaction I have with him done over e-mail from home!  In reading over
the materials Joanne has given me and I am waiting for one more from her today,
the 2 charges and what they entail are probably sufficient.

It is important to note that [Mr. Doe] is in this arena now for false statements, and
causing emotional distress to other teammates not to mention potential defamation
of character on the part of Andres.  I think there is sufficient information for a
formal hearing and not an informal resolution.  Given my limited exposure to
[Mr. Doe's father] he does not seem to grasp [Mr. Doe's] responsibility in this
pending case and have intimated that we are perpetuating the anxiety for [Mr.
Doe].  Having the hearing on Thursday is the earliest that seems fair for all to be
properly prepared.  I want to speak with [Paula Person] and [Susan Student]
tomorrow for clarification as to how they feel now. They are the only 2 left from
the original incident that I have not heard from directly.

Bonni can attest that I am not that scary in these hearings!

M [Dean Keizer]

138.    Later on April 4, 2016, Bonni Alpert, who had previously served as Mr. Doe's

confidential disability counselor, wrote to Dean Keizer and Dean Hart-Steffes:

From: Bonni M. Alpert
Sent: Monday, April 04, 2016 4:29 PM
To: Maureen H. Keizer <maureen.keizer@wne.edu>; Jeanne Steffes
<jeanne.hart-steffes@wne.edu>
Subject: RE: [Mr. Doe]'s hearing
I spoke to [Mr. Doe's father] earlier today.  I did not share the details of the
charges, since I did not know what they were; however, I did let [Mr. Doe's
father] know how good you (Moe) are at this and that I could guarantee that you
would do whatever you could to help put [Mr. Doe] at ease.  I also suggested that,
as long as I received the go-ahead from [Mr. Doe], I would be happy to share
what I knew about [Mr. Doe], and how some of our recent conversations may

shed some light on his current predicament.  I have not heard from [Mr. Doe] yet,
but would be happy to talk to you once I do, if you think this would be helpful?

Also, I'm just wondering what the purpose of a formal vs. informal hearing would
be?  I have to admit that I'm concerned about what a formal hearing will do to
[Mr. Doe]'s emotional stability and ability to complete this semester.  If there is a
reason to hold a formal hearing, then I defer to you.

 Thank you,

Bonni

Bonni Alpert, Ed.D
Assistant Dean, Student Disability Services
Western New England University

139.    Internal WNEU correspondence, dated April 5, 2016, reveals that Dean Keizer

acknowledged and "completely underdst[ood]" that Mr. Doe suffered from "processing issues"

relating to his disabilities.

140.    On April 7, 2016, Dean Keizer sent Mr. Doe a letter informing him of the alleged

violations.  *See* Exhibit A.  This notice was provided less than 24 hours before the actual hearing.

141.    In addition to being late, Dean Keizer's April 7, 2016 letter only cited the alleged

violations, and did not tell Mr. Doe how he allegedly violated them.  *See* Exhibit A.  For

example, Mr. Doe was accused of a violation WNEU's Student Code of Conduct, specifically

"Article III: Specific Standards of Behavior, Subpart A., Offenses Against Persons, such as:

Intentionally or recklessly threatening or causing another person emotional distress."  *Id.*

However, the Defendants' letter never informed Mr. Doe of the identity of the person(s) against

whom he allegedly caused emotional distress, when he allegedly did so, or how.  *Id.*

142.    The April 7, 2016 letter also accused Mr. Doe of "Intentionally furnishing or

conveying false or misleading information to any University official," which is in violation of

WNEU's Student Code of Conduct, Section Two, Article III(C).  *Id.*   The letter provided no

specifics as to how or when Mr. Doe committed this offense. The "to wit" portion of the charge was omitted. *Id.*

143.    Effectively, there was no way for Mr. Doe to know what he was accused of doing to violate the above two standards cited in the April 7, 2016 letter. *Id.*

144.    The two violations referenced above are located under WNEU's Student Code of Conduct, Section Two, Article III (A) and (C). Under the Code of Conduct, these two offenses each triggered heightened sanctions. For example, items under Subparts A – C, as per the Student Handbook, carried the following possible sanctions:

a.    Notation on transcript for 1-6 years (*See* Student Handbook 2015 – 2016, Section Three, Article VII(A));

b.    Suspension (*See id.*, Section Four, Article III); and

c.    Dismissal from the University (*See id.*, Section Four, Article III).

145.    Also according to the Student Handbook and Code of Conduct, offenses listed under Section Two, Article III (A) and (C), of which Mr. Doe was accused, automatically fall under WNEU's Code of Conduct, Section Four, Article III, and thereby trigger the right of the accused certain due process standards, which WNEU never provided to Mr. Doe throughout his investigation, hearing or sanctioning.

146.    Specifically, Under WNEU policies Mr. Doe was entitled to and WNEU deprived him of:

a.    "A pre-hearing informational meeting with the administrative officer," during which the "report(s) about alleged misconduct will be read and explained, in that s/he is not entitled to a copy," "a written outline of the judicial process and an oral explanation of that process," "a written statement identifying the … possible

sanctions that might apply," and notice that s/he is entitled to an accommodation in the event of "an impairment or disability" as guaranteed by WNEU's Student Handbook 2015 – 2016, Section Four, Article III(A)(1)(a)-(d);

b. "Two days written notice in advance of the hearing," which shall include "the name(s) of person(s) asked to attend the hearing by the administrative officer," "the date, time and location of the hearing," and "the specific charge(s) relating to the alleged misconduct" as guaranteed by WNEU's Code of Conduct, Section Four, Article III(A)(2)(a)-(c);

c. The ability to read the judicial materials and documents and request clarifications pursuant to WNEU's Code of Conduct, Section Four, Article III(B)(3);

d. The ability to choose his own advisor pursuant to WNEU's Code of Conduct, Section Four, Article III(B)(5) and Article III(E);

e. The ability to provide a list of witnesses in his own defense pursuant to WNEU's Code of Conduct, Section Four, Article III(B)(5);

f. The ability to have a neutral hearing officer decide his case based on external witnesses and evidence, rather than having his case decided by a hearing officer who investigated the case herself and proffered the evidence to Mr. Doe at the hearing (*See* WNEU's Code of Conduct, Section Four, Article III(B)(8)) (indicating that upon default a hearing will be decided on evidence presented to not obtained by the hearing officer);

g. The ability to make elections as to hearing alternatives under WNEU's Code of Conduct, Section Four, Article III(C);

h.   The ability to submit a written witness statement from his father, a known

witness, pursuant to  WNEU's Code of Conduct, Section Four, Article III(E)(4);

i.   The ability to hear any witness statements pursuant to WNEU's Code of Conduct,

Section Four, Article III(F)(1);

j.   The ability to submit his own evidence pursuant to WNEU's Code of Conduct,

Section Four, Article III(F)(2);

k.   The ability to have a separate entities decide the findings and sanctions phases of

the case pursuant to WNEU's Code of Conduct, Section Four, Article III(F)(5);

l.   The ability to receive notice of the decision within three working days pursuant to

WNEU's Code of Conduct, Section Four, Article III(G);

m.   The write to a review or appeal of the decision pursuant to WNEU's Code of

Conduct, Section Four, Article III(H)[4];

147.   WNEU also failed to offer Mr. Doe conflict resolution resources as provided

under WNEU's Code of Conduct, Section Three, Article III, "Informal Resolution" under

Section Three Article IV(A), or other lesser or more informal processes for which he was eligible

as a student with no disciplinary record (and which Dean Alpert suggested but Dean Keizer

rejected).

148.   When Mr. Doe appeared for the hearing the next day, he had no way of knowing

what he had done wrong to allegedly violate the two standards in the April 7, 2016 letter.  At the

Code of Conduct questioning, Mr. Doe learned that the allegations might, incredibly, have

something to do with Ms. Person and Ms. Student.

---

[4]   In the instant case, Mr. Doe and his family were told that no appeal of any kind was possible.  This is corroborated by the fact that no appellate or review options were provided in Dean Keizer's April 13, 2016 letter of decision.

149.    At that time, Mr. Doe offered to provide to WNEU and Dean Keizer all of his text messages between himself and Ms. Person and Ms. Student, which are described above. Mr. Doe had printed the messages and organized them in a manila folder, which he attempted to present to WNEU. He explained that the messages contained exculpatory information as to the true nature of his friendly and supportive relationship with Ms. Student and Ms. Person. WNEU and Dean Keizer refused to accept or even review the exculpatory messages.

150.    Other than brief use of his laptop, Mr. Doe was not provided with a recording device, note-taking aids, a note-taker, or any reasonable accommodations pursuant to his disabilities, requests, or his individualized education program, which were registered with WNEU and were similarly denied at his Title IX questioning.

151.    By letter dated April 13, 2016, WNEU and Dean Keizer found Mr. Doe in violation of the Student Code of Conduct. Specifically, the Defendants found Mr. Doe in violation of causing Ms. Person and Ms. Student emotional distress by telling them that members of the men's tennis team were saying negative things about them behind their back. Second, the Defendants found Mr. Doe in violation of the vague "Western New England Way." *Id*.

152.    Mr. Doe was never informed of the possible sanctions or permitted to bring witnesses who would have been exculpatory on findings or sanctioning.

153.    The "Western New England Way" is a vague mission statement from WNEU's athletics website, which is not part of the Student Handbook or the Code of Conduct.

154.    Mr. Doe's disability counselor had reminded WNEU about Mr. Doe's disabilities and warned WNEU about the negative effect that WNEU's actions might have on Mr. Doe's mental health. WNEU ignored the disability counselor's advice and warnings.

155.    Throughout the inadequate Title IX and Code of Conduct investigations, the Defendants never once consulted or relied on advice from their general counsel, who later admitted she had no involvement in any aspect of the case.

**THE DEFENDANTS CAUSED MR. DOE TO SUFFER SEVERE INJURIES**

156.    Before the Defendants' Title IX investigation, Mr. Doe was asymptomatic and clinically stable for many years, to the point that he was off all medications.

157.    As a direct and proximate result of the Defendants' actions, Mr. Doe has developed and suffered from the following diagnosed injuries:

   a.   Severe recurrent major depressive disorder characterized by low mood, inability to sleep, poor concentration, over thirty pounds in weight loss, and severe anxiety.

   b.   Post-traumatic stress disorder characterized by brooding, re-experiencing, hypervigilance, and emotional distress and numbing.

   c.   Recurrent vomiting, tremors, shaking, stuttering, nausea, nightmares, painful bloody diarrhea, marked diaphoresis, and the inability to concentrate.

   d.   Intense aggravation of Mr. Doe's obsessive-compulsive disorder and autistic disorder, which, once dormant, have surged to all-time high levels.

   e.   Depression, anger, insomnia, loss of appetite, hopelessness, and emotional distress.

158.    In addition to the above diagnoses, Mr. Doe's treating physicians have opined that:

   a.   "But for the Defendants' actions, he [Mr. Doe] would not be sick" or suffering from the above mental and physical sicknesses, conditions, symptoms and disorders.

b.  The Defendants' actions directly and proximately "activated parts of his [Mr. Doe's] autism that had been dormant for years."

c.  The Defendants' actions against Mr. Doe "directly precipitated [Mr. Doe's] severe post-traumatic stress disorder."

d.  Since the Defendants' Title IX investigation, "no treatments or medications are helping" Mr. Doe.

e.  Before the Title IX investigation, Mr. Doe was "a brilliant savant" with "a plum internship and employment opportunities" at Pratt & Whitney, and now he has nothing.

f.  Now, "without intense family support, he [Mr. Doe] would need hospitalization" for the effects caused by the Defendants' actions.

159.    Ignoring contractually promised procedural due process, the Defendants wrongfully found Mr. Doe in violation of the Code of Conduct for allegedly causing emotional distress to two female teammates on the tennis team.  The Defendants wrongfully removed Mr. Doe from the tennis team, isolating him from his support group and wrongfully discharging him from his work-study employment.  The Defendants wrongfully effectuated an unlawful no-contact gag order preventing Mr. Doe from speaking to any of his former teammates and friends on the tennis team, an act that would foreseeably aggravate his disabilities.  The Defendants wrongfully refused to pay him his wages owed pursuant to his work-study position stringing rackets for the team.

160.    Mr. Doe had no other positive social interactions at WNEU other than the tennis team, of which he had been a member for three and a half years.  The uprooting of Mr. Doe's

social identity caused Mr. Doe intense and severe emotional pain for the remainder of his time at WNEU, which still exists today.

161.    Mr. Doe was completely alone from the day of his being ordered away from the tennis team until the day of his graduation.  He had little if any positive social interactions of any kind.

162.    After the Defendants' actions, Mr. Doe was not able to successfully make it through an interview without intense shaking and inability to perform or communicate adequately based on his above injuries, which were caused by the Defendants.

163.    As a direct and proximate cause of the Defendants' actions, Mr. Doe was unable to obtain employment after college for approximately one year, and he has been forced to reside with his parents who have assisted him with his injuries.

## CAUSES OF ACTION

### COUNT ONE
### Violation of the Educational Amendments of 1972 (Title IX)
### 20 U.S.C. § 1681 *et seq.*
### (Retaliation, Disparate Treatment, Failure to Enforce Title IX, Failure to Property Train Employees on Title IX)

164.    Mr. Doe incorporates by reference all other paragraphs of this Complaint as though fully stated herein.

165.    Under Title IX, 20 U.S.C. § 1681, it is unlawful for an educational institution receiving federal funds to discriminate on the basis of sex.

166.    Reports of sexual harassment of a student by another student, including sexual assault and sex-based violence, trigger a funding recipient's duties under Title IX to respond with appropriate corrective measures.

167.    WNEU's Title IX policy, as contained with the Student Code of Conduct, was deficient in that it provided no anti-retaliation measures and did not even contemplate the concept of retaliation against a Title IX reporter.  It also failed to comply with federal Title IX guidelines.

168.    WNEU failed to adequately train its employees, including all named Defendants, with respect to Title IX compliance and anti-retaliation.

169.    An inadequate response by a funding recipient to a complaint violates its responsibilities under Title IX.

170.    Mr. Doe engaged in statutorily protected activity by reporting to WNEU and Coach Kolins the existence of sexual misconduct, harassment, unlawful behavior, and bullying resulting in the victimization of two female WNEU students.  He also participated in a protected activity by participating as a Title IX witness.

171.    Defendant WNEU inadequately responded to Mr. Doe's reports of Title IX misconduct, sexual misconduct, harassment, unlawful behavior, and bullying.

172.    Defendant WNEU conducted an inadequate Title IX investigation in which Mr. Doe was interviewed but interrogated as if he had committed wrongdoing.

173.    WNEU was aware that pursuant to Mr. Doe's disabilities, Mr. Doe is afforded an individualized education program by which he is permitted note-taking services and additional time in class.  None of these services were provided when Mr. Doe was interviewed and questioned.  Mr. Doe was so taken aback by the hostile nature of his questioning that it caused him to fall to the floor and vomit immediately after he left the room.

174.    WNEU first concluded that no Title IX violation occurred, then turned its focus on Mr. Doe, branding him the subject of violations of WNEU's Code of Conduct.

175.    The Code of Conduct investigation was based on an easily refutable statement by a female student, Ms. Person, that Mr. Doe was somehow causing her emotional distress.

176.    Mr. Doe attempted to provide text message evidence, including the messages stated above, which demonstrated that he had not violated the Code of Conduct and that he had not caused emotional distress to anyone.

177.    Based on his gender and reporting, WNEU credited an accusation of a female student against Mr. Doe, and refused to consider or review evidence supplied by Mr. Doe that demonstrated that he had not violated the Code of Conduct.

178.    Upon information and belief, WNEU has had a history of refusing to consider evidence produced by male students in "he said, she said" cases involving discrepancies between male and female students.  For example, approximately one year before Mr. Doe's case, a WNEU female student accused a WNEU male student of sexual assault.  When the WNEU male student attempted to provide text messages written by the female student that evidenced consensual sex, WNEU refused to review the male student's exculpatory evidence, instead opting to believe the female student and discredit the male student.

179.    Similarly, in the instant matter, WNEU decided from the start to believe the claim from Ms. Person's interview over Mr. Doe's word and evidence.  WNEU unreasonably discredited Mr. Doe because he was a male, and refused to review his evidence.  WNEU officials brazenly told Mr. Doe in his Conduct hearing that they would not believe him.

180.    Upon WNEU's dismissal of Mr. Doe's reporting of the existence of sexual misconduct, harassment, unlawful behavior, and bullying resulting in the victimization of two female WNEU students, WNEU found Mr. Doe in violation of the Code of Conduct.  As a result,

Mr. Doe suffered adverse actions by being removed from the men's tennis team both as a player and as a work study employee.

181.    Mr. Doe's reporting of Title IX misconduct, sexual misconduct, harassment, unlawful behavior, and bullying was the reason for WNEU's investigation, adverse findings, and sanctions against Mr. Doe.

182.    By eliminating Mr. Doe's Title IX and other reports, WNEU avoided bad publicity for its administrators, tennis coaches, student-athletes and the university as a whole.

183.    The alleged sexual assailant that Mr. Doe was reporting about is, upon information and belief, still employed to this day by WNEU.

184.    The investigation and hearing that Western New England University administered did not comply with WNEU's own due process and fairness standards or any reasonable standard by which a Title IX investigation should be implemented.

185.     WNEU failed to adequately and meaningfully investigate the reported the Title IX violations reported by Mr. Doe.

186.    By failing to listen to Mr. Doe, by failing to provide Mr. Doe a forum in which to raise his complaint that sexual misconduct was ongoing, by failing to provide Mr. Doe a forum accommodating to his disabilities, WNEU acted with deliberate indifference toward Title IX, Mr. Doe's rights to report violations of Title IX, and the rights of its students to enjoy a learning community free from sexual misconduct, sexual harassment, and bullying.

187.    Defendant WNEU failed to properly and adequately train its employees, including the remaining defendants, to safeguard the federally protected Title IX rights of reporting students.

188.     As a direct and proximate result of WNEU's practices detailed above that were sufficiently severe to interfere with Mr. Doe's ability to participate in and enjoy the benefits of the educational services offered by WNEU, and as a direct and proximate result of the WNEU's deliberate indifference to Mr. Doe's right to be free from sexual misconduct, including his right to access to a forum for reporting Title IX violations and in a manner free from retaliation, Mr. Doe was denied access to a safe and secure educational environment in violation of Title IX, and Mr. Doe was injured by Western New England University's inadequate Title IX response protocol, investigation, and hearing processes and retaliation.

189.     The Defendants' aforesaid wrongful acts and omissions caused Mr. Doe to suffer emotional distress and physical injuries.

190.     Mr. Doe endured mental suffering and anguish, emotional and psychological injury and physical consequences thereof, all resulting from the emotional distress caused by Defendants' said wrongful acts and omissions.

191.     Mr. Doe seeks compensatory damages in an amount to be determined by a jury, as well as all other available forms of relief including but not limited to punitive damages, attorney's fees, costs, expert costs and interest where applicable.

## COUNT TWO
## VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT
### (42 U.S.C. § 12182, *et seq.*)

192.     Mr. Doe incorporates by reference all other paragraphs of this Complaint as though fully stated herein.

193.     Mr. Doe was a qualified individual with a disability

194.     The Defendants were subject to the Americans with Disabilities Act.

195.    Mr. Doe was denied the opportunity to participate in or benefit from the Defendants' services programs, and activities, and was otherwise discriminated against by the Defendants because of his disabilities.

196.    Said discriminations included failures to make reasonable accommodations for Mr. Doe's disabilities.

197.    The Defendants failed to account for or accommodate Mr. Doe's disabilities during the Title IX and Code of Conduct investigations.

198.    The Defendants failed to implement institutional safeguards required or compliance with federal protections of disabled students.

199.    Defendant WNEU failed to properly and adequately train its employees, including the remaining defendants, to safeguard the federally protected ADA rights of disabled students.

200.    The Defendants acted with deliberate indifference toward the federally protected rights of Mr. Doe as a student with document disabilities.

201.    The Defendants had actual authority to address and correct discrimination suffered by Mr. Doe but failed to do so.

202.    The Defendants violated Mr. Doe's privacy by sharing medical information and information about Mr. Doe's disabilities with witnesses in the investigations.

203.    The Defendants' aforesaid wrongful acts and omissions caused Mr. Doe to suffer emotional distress.

204.    Mr. Doe endured mental suffering and anguish, emotional and psychological injury and physical consequences thereof, all resulting from the emotion distress caused by Defendants' said wrongful acts and omissions.

205.    Mr. Doe seeks compensatory damages in an amount to be determined by a jury, as well as all other available forms of relief including but not limited to punitive damages, attorney's fees, cost and interest, as appropriate.

## COUNT THREE
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT
## (29 U.S.C. § 701-796)

206.    Mr. Doe incorporates by reference all other paragraphs of this Complaint as though fully stated herein.

207.    Defendant WNEU received federal financial assistance.

208.    Defendant WNEU was subject to Section 504 of the Rehabilitation Act of 1973.

209.    The Defendants excluded Mr. Doe from participation in, denied Mr. Doe the benefits of, and subjected Mr. Doe to discrimination under a program or activity receiving federal financial assistance.

210.    The Defendants' aforesaid wrongful acts and omissions caused Mr. Doe to suffer emotional distress.

211.    Mr. Doe endured mental suffering and anguish, emotional and psychological injury and physical consequences thereof, all resulting from the emotion distress caused by Defendants' said wrongful acts and omissions.

212.    Mr. Doe seeks compensatory damages in an amount to be determined by a jury, as well as all other available forms of relief including but not limited to punitive damages, attorney's fees, cost and interest, as appropriate.

## COUNT FOUR
## BREACH OF CONTRACT: 2015-2016 STUDENT HANDBOOK

213.    Mr. Doe incorporates by reference all other paragraphs of this Complaint as though fully stated herein.

214.    In Massachusetts, statements in "handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials can form the basis of a valid contract." *Russell v. Salve Regina Coll.*, 890 F.2d 484, 488 (1st Cir. 1989).

215.    The Defendants breached its contract with Mr. Doe by failing to adhere to WNEU's 2015 – 2016 Student Handbook, Code of Conduct, and Title IX policies as detailed above and deprived Mr. Doe of the many aforementioned contractually rights afforded to him thereunder.

216.    The Defendants also breached its contract with Mr. Doe by failing to provide Mr. Doe enough time to prepare for his Code of Conduct hearing.

217.    The Defendants also breached its contract with Mr. Doe by failing to provide Mr. Doe proper notice of the actions that he committed, when, and upon whom, which allegedly violated WNEU standards.

218.    The Defendants also breached its contract with Mr. Doe by denying him the opportunity to call witnesses or present evidence.

219.    The Defendants also breached its contract with Mr. Doe, inter alia, by refusing to review or consider his text messages, which he offered to Defendants.

220.    The Defendants also breached its contract with Mr. Doe by finding Mr. Doe in violation of the "Western New England Way" and sanctioning him for this standard which does not appear in the Student Handbook or Code of Conduct, and for doing so without any notice or due process.

221.    The Defendants also breached its contract with Mr. Doe by denying him other procedural and appellate rights.

222.    The Defendants also breached its contract with Mr. Doe by violating its confidentiality policy executed on April 17, 2012.

223.    Mr. Doe seeks compensatory damages in an amount to be determined by a jury, as well as all other available forms of relief including but not limited to punitive damages, attorney's fees, cost and interest, as appropriate.

## COUNT FIVE
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING: 2015-2016 STUDENT HANDBOOK

224.    Mr. Doe incorporates by reference all other paragraphs of this Complaint as though fully stated herein.

225.    In Massachusetts, statements in "handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials can form the basis of a valid contract." *Shin v. Mass. Inst. of Tech.*, No. 020403, 2005 Mass. Super. LEXIS 333, 2005 WL 1869101, at *6 (Mass. Super. June 27, 2005) (citing *Russell v. Salve Regina Coll.*, 890 F.2d 484, 488 (1st Cir. 1989)).

226.    In addition to its explicit terms, a contract between a University and its students, like any contract, imposes an implied obligation of good faith and fair dealing.  Restatement (Second) of Contracts § 205 (1981); *Clark v. State St. Trust Co.*, 270 Mass. 140, 153, 169 N.E. 897 (1930).

227.    The Defendants breached the covenant with Mr. Doe by failing to adhere to WNEU's 2015 – 2016 Student Handbook, Code of Conduct, and Title IX policies as detailed

above and deprived Mr. Doe of the many aforementioned contractual rights afforded to him thereunder.

228.     The Defendants also breached the covenant with Mr. Doe by failing to provide him enough time to prepare for his Code of Conduct hearing.

229.     The Defendants also breached the covenant with Mr. Doe by failing to provide him proper notice of the actions that he allegedly committed, when, and upon whom, which allegedly violated WNEU standards.

230.     The Defendants also breached the covenant with Mr. Doe by denying him the opportunity to call witnesses or present evidence.

231.     The Defendants also breached the covenant with Mr. Doe by refusing to review or consider his text messages, which he offered to produce to the Defendants.  Mr. Doe had printed the text messages and tried to hand them to the Defendants at his hearing, but the Defendants refused to even acknowledge the text messages.

232.     The Defendants also breached the covenant by finding Mr. Doe in violation of the "Western New England Way" and sanctioning him for this standard which does not appear in the Student Handbook or Code of Conduct, and for doing so without any notice or due process.

233.     The Defendants also breached the covenant with Mr. Doe by violating its confidentiality policy executed on April 17, 2012.

234.     Mr. Doe seeks compensatory damages in an amount to be determined by a jury, as well as all other available forms of relief including but not limited to punitive damages, attorney's fees, cost and interest.

## COUNT SIX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

235.    Mr. Doe incorporates by reference all other paragraphs of this Complaint as though fully stated herein.

236.    The Defendants were aware of Mr. Doe's medical conditions and disabilities as described above.

237.    The Defendants were aware of Mr. Doe's reports of misconduct as described above.

238.    The Defendants knew that emotional distress was the likely result of the Defendants' conduct as described above, to include dismissing Mr. Doe's Title IX and other reports without fully investigating them, accusing Mr. Doe of a Code of Conduct violation in response to his reporting, refusing to consider text messages offered by Mr. Doe, finding Mr. Doe in violation of the Code of Conduct, and removing him from his positions on the tennis team.

239.    The Defendants' conduct, including retaliation and disregard for Mr. Doe's disabilities, federal procedures under Title IX, and a fair review of all evidence, and other misconduct as stated herein, was beyond all possible bounds of decency and utterly intolerable in a civilized community.

240.    The Defendants breached a duty owed to Mr. Doe which caused him to fear for his own physical safety, educational standing, ability to work in the future, and ability to trust others.

241.    The Defendants' actions in fact caused Mr. Doe to suffer emotional distress, and at least one medical provider has concluded the same.

242.    The Defendants' retaliation and punishments of Mr. Doe caused him to suffer physical harm manifested by objective symptomatology, to include depression, post-traumatic stress disorder, insomnia, vomiting, nightmares, diarrhea, emotional distress, and other physical and mental anguish and injuries.

243.    Mr. Doe's emotional distress was severe and of a nature that no reasonable person could be expected to endure it.

244.    WNEU acted through the other named Defendants and its instrumentalities in the intentional infliction of emotional distress upon Mr. Doe.

245.    The Defendants' aforesaid wrongful acts and omissions caused Mr. Doe to suffer emotional distress.

246.    Mr. Doe endured mental suffering and anguish, emotional and psychological injury and physical consequences thereof, all resulting from the emotion distress caused by Defendants' said wrongful acts and omissions.

247.    Mr. Doe seeks compensatory damages in an amount to be determined by a jury, as well as all other available forms of relief including but not limited to punitive damages, attorney's fees, cost and interest, as appropriate.

## COUNT SEVEN
## NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

248.    Mr. Doe incorporates by reference all other paragraphs of this Complaint as though fully stated herein.

249.    The Defendants negligently engaged in extreme and outrageous conduct, and as a direct result of such conduct caused Mr. Doe to suffer server emotional distress.

250.     The Defendants were on notice of all of Mr. Doe's disabilities and acted

negligently with respect to his circumstances.

251.     The Defendants breached a duty owed to Mr. Doe which caused him loss of

society and unnecessary fear and anxiety about his own physical safety, educational standing,

ability to work in the future, and ability to trust others.

252.     Defendant WNEU acted through the other named Defendants and its

instrumentalities in the negligent infliction of emotional distress upon Mr. Doe.

253.     The Defendants' aforesaid wrongful acts and omissions caused Mr. Doe to suffer

emotional distress and physical injuries.

254.     Mr. Doe seeks compensatory damages in an amount to be determined by a jury, as

well as all other available forms of relief including but not limited to punitive damages,

attorney's fees, cost and interest, as appropriate.


**COUNT EIGHT**
**PENDENT VIOLATION OF PRIVACY UNDER M.G.L. c. 214, § 1B**
**AND RIGHT TO PRIVACY UNDER THE COMMON LAW**

255.     Mr. Doe incorporates by reference all other paragraphs of this Complaint as

though fully stated herein.

256.     Mr. Doe was entitled to a right of privacy, a right of solitude and seclusion, and a

right to be left alone, which is codified at M.G.L. c. 214, § 1B.

257.     The Defendants shared Mr. Doe's private medical and disability information with

at least one witness in the Title IX and Code of Conduct investigations without Mr. Doe's

permission or authorization.

258.     Mr. Doe's private medical and disability information was used in an attempt to

discredit Mr. Doe in the two WNEU investigations.

259.    As a direct and proximate result of the Defendants' unauthorized distribution of Mr. Doe's private healthcare information, and other misconduct as described more fully herein, caused Mr. Doe to suffer emotional distress.

260.    Mr. Doe endured mental suffering and anguish, emotional and psychological injury and physical consequences thereof, all resulting from the emotion distress caused by Defendants' said wrongful acts and omissions.

261.    Mr. Doe seeks compensatory damages in an amount to be determined by a jury, as well as all other available forms of relief including but not limited to punitive damages, attorney's fees, cost and interest, as appropriate.

## COUNT NINE
## PENDENT VIOLATION OF M.G.L. c. 149, § 148

262.    Mr. Doe incorporates by reference all other paragraphs of this Complaint as though fully stated herein.

263.    Based on Mr. Doe's work study agreement and contract with WNEU, Mr. Doe was qualified to be compensated for all of his earned wages, unused accrued sick time, and unused accrued vacation time upon the end of his employment in April of 2016.

264.    Mr. Doe was hired by WNEU on or about September 13, 2013 until his discharge in April of 2016.

265.    WNEU failed to compensate Mr. Doe, an hourly worker, on a bi-weekly basis.

266.    Mr. Doe worked many hours for WNEU for which he as not compensated.

267.    WNEU paid Mr. Doe only $500 per semester despite the fact that, based on his many hours worked, Mr. Doe's hourly rate fell below the lawful minimum wage.

268.    Upon his discharge in April of 2016, Mr. Doe was not paid for any of his work which occurred from September of 2015 through April of 2016.

269.    WNEU terminated Mr. Doe without paying him all of his wages due.

270.    Mr. Doe filed a timely Wage and Hour Act complaint with the Attorney General's office.

271.    In response, Mr. Doe received a "right to sue" letter from the Massachusetts Attorney General's office.

272.    Mr. Doe suffered damages as result of WNEU's violations of M.G.L. c. 149, § 148.

## **PRAYER FOR RELIEF**

273.    WHEREFORE, Mr. Doe prays that the Court enter judgment in his favor against Defendants, containing the following relief:

a.     Compensatory and any other damages, including but not limited to lost wages, permanent and other physical and emotional suffering, medical expenses, and other damages and injuries caused by the Defendants' wrongful and negligent acts;

b.    Removal of any negative or adverse findings in Mr. Doe's student record;

c.    Attorney's fees and costs, and interest;

d.    Punitive damages, if available;

e.    Statutory and treble damages, where appropriate;

f.    Costs and expenses; and

g.    Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

274.    Mr. Doe, by and through his attorney, Michael G. McDonough, Esq., of Egan Flanagan and Cohen, P.C., Springfield, Mass., demands a trial by jury on all issues so triable.

FOR THE PLAINTIFF,
JOHN DOE (A PSEUDONYM),
BY HIS ATTORNEY,

*/s/ Michael G. McDonough*

Michael G. McDonough, Esq. BBO#682128
Egan, Flanagan & Cohen, P.C.
67 Market Street – P.O. Box 9035
Springfield, MA 01102-9035
Tel: (413) 737-0260; Fax: (413) 737-0121
Email: mgm@efclaw.com

September 5, 2019

16665-160714\37308